Filed 4/7/23  In re Derek M. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re DEREK M. et al., Persons Coming Under the Juvenile Court Law. | B320496<br><br>(Los Angeles County Super. Ct. No. 18CCJP06928A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>JOHNNY M. and CHRISTOPHER C.,<br><br>     Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County. Philip L. Soto, Judge. Affirmed in part and conditionally reversed in part with directions.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant Johnny M.

Michelle Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant Christopher C.

Dawyn Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

—————————————

Johnny M., the father of Derek M., and Christopher C., the father of Aliyah C. and Alyssa C., appeal from the juvenile court's orders terminating parental rights under Welfare and Institutions Code[1] section 366.26. Johnny also appeals the juvenile court's denial of his section 388 petition. The mother of all three children is not a party to the appeal.

Johnny contends the juvenile court abused its discretion in denying the section 388 petition. He challenges the denial on the grounds that he presented new evidence showing a change of circumstances, and therefore established it is in Derek's best interests to have another chance to reunify and enjoy unmonitored visits with his father. Johnny also argues for reversal of the order terminating his parental rights based on the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i). He contends that because he maintained regular visitation and contact with Derek, Derek had a substantial and positive emotional relationship with his father, thereby establishing that termination of Johnny's parental rights would be detrimental to Derek.

Johnny and Christopher both contend the juvenile court's finding that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) did not apply was erroneous because it was

—————————————

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

predicated upon a defective ICWA inquiry by the Los Angeles County Department of Children and Family Services (DCFS).[2] DCFS does not oppose a remand for further inquiry in accordance with ICWA.

We disagree with Johnny's assertions regarding the juvenile court's findings and orders denying his section 388 petition and terminating parental rights under section 366.26. However, we agree that further ICWA inquiry is warranted in this case, and therefore conditionally reverse the juvenile court's orders terminating Johnny's and Christopher's parental rights and remand the matter for the limited purpose of ensuring compliance with the requirements of ICWA and related state law. If, based on the completed ICWA inquiry, the juvenile court finds no reason to believe Derek, Aliyah or Alyssa is an Indian child, or if no tribe or agency determines any of the children is an Indian child, the orders terminating parental rights shall be reinstated as the orders of the juvenile court.

**FACTUAL AND PROCEDURAL BACKGROUND**

*1. Initial detention, adjudication and disposition*

Derek was born in April 2010.

In July 2017 DCFS received a referral alleging a domestic violence incident between Mother and Johnny during which both parents grabbed Derek. DCFS substantiated the allegations, referred Mother to counseling, and closed the referral. Mother

---

[2] Christopher's sole contention on appeal is that the juvenile court and respondent failed to comply with the duty of inquiry pursuant to ICWA and related California statutes, requiring a conditional reversal and remand.

3

obtained a permanent restraining order against Johnny protecting herself and Derek.

Aliyah was born in March 2018.

In September 2018, DCFS received a new referral alleging general neglect of Derek and Aliyah by Mother. At that time, Mother, Derek and Aliyah were living with Christopher, and Johnny's whereabouts were unknown. On October 26, 2018, DCFS filed a section 300 petition on behalf of Derek and Aliyah alleging the children were at risk due to the previously reported domestic violence between Johnny and Mother, Mother's substance abuse (methamphetamine and amphetamine), and Christopher's substance abuse (alcohol).

The juvenile court sustained the section 300 petition and at the disposition hearing on December 13, 2018, ordered the children removed from parental custody with reunification services and monitored visitation. The court ordered Johnny to participate in a 26-week DCFS/court-approved domestic violence program for perpetrators, a parenting class, and individual counseling with a licensed DCFS-approved therapist to address child protection, conflict resolution, and anger management.

### 2. Reunification: December 2018 to June 2020

Between December 2018 and May 2019, Johnny had weekly monitored visits with Derek. Derek reported that he loved his visits with both his mother and his father, and he wanted to live with both of them.

Alyssa was born in May 2019, and DCFS filed a section 300 petition as to her on May 31, 2019. The juvenile court sustained the petition and ordered Alyssa to remain in Mother's custody. Mother began overnight visits with Derek and Aliyah on June 1, 2019. At the six-month review hearing on June 13, 2019, the

4

juvenile court returned Derek and Aliyah to Mother's custody with family maintenance services. The court granted Johnny unmonitored visits, once a week for four hours.

Johnny completed his parenting program (16 classes) in June 2019, and his domestic violence program (26 sessions) in August 2019.

Derek reported that he enjoyed spending time with his father and asked to have overnight visits with him. On November 1, 2019, DCFS granted Johnny overnight weekend visits with Derek, which continued until the COVID-19 pandemic hit in March 2020. Thereafter, Derek and Johnny's visits took place over video chat.

### 3. Re-detention and adjudication: May to August 2020

In May 2020, Mother tested positive for methamphetamine and Christopher also relapsed. On May 20, 2020, Derek was moved to Johnny's home. But the next day DCFS received an anonymous text message that Johnny was using methamphetamine. On May 22, 2020, Johnny tested positive for methamphetamine and amphetamine. Derek was returned to his mother's care on June 3, 2020.

On June 12, 2020, DCFS detained Derek, Aliyah, and Alyssa and placed them in foster care. Derek said he felt good about being placed in foster care because he only felt safe in foster care or with Johnny. The foster parents reported that Derek, Aliyah, and Alyssa were comforted by each other's presence and wanted to be together.

On August 12, 2020 the juvenile court ordered the children removed from the parents with reunification services. The court ordered Johnny to participate in a full drug/alcohol program for a

5

minimum of six months, random or on-demand drug testing, parenting classes, and individual therapy.

In an interview with DCFS on July 10, 2020, Johnny admitted that he used methamphetamine with Mother on a regular basis for about two years starting when Derek was three or four years old. But he claimed he had been sober until two weeks before Derek was placed in his care, and his last drug use was the day of his positive test in May. He told DCFS he intended to remain sober and comply with all programs to get Derek back, but he tested positive for methamphetamine and amphetamine again that day.[3] DCFS found Johnny's statement that he had refrained from drug use prior to May 2020 was not credible.

### 4. Reunification: August 2020 to December 2021

Between August and October 2020, Johnny attended an eight-week outpatient program through Kaiser, and in November he enrolled in an outpatient program through MFI Recovery Center. But he tested positive for methamphetamine and amphetamine on December 8, 2020, and between August 5, 2020, and January 7, 2021, all 15 of his other scheduled drug tests were "no-shows."

On January 22, 2021, all three children were placed with their maternal great uncle Alejandro and his wife Diana, who stated they were open to adopting the children in the event reunification with the parents failed. Derek reported being happy to be with his relatives.

---

[3] Johnny also tested positive for methamphetamine on July 27, 2020, and was a "no-show" for drug tests on June 29, July 13, and July 22, 2020.

Johnny continued with the MFI program until March 31, 2021, when he was discharged for lack of attendance. In January and March he had two negative drug tests with MFI, but on February 25, 2021, he tested positive for methamphetamine and amphetamines. Johnny missed two DCFS-scheduled drug tests in January and February. In the meantime, however, Johnny's weekly two-hour visits with Derek were going well.

At the six-month review hearing on March 25, 2021, the juvenile court ordered continued reunification services. The court ordered Johnny to continue drug testing, but specified that a missed test would be considered a positive test. Thereafter, Johnny missed the next five drug tests scheduled by DCFS in April, May, and June 2021.

Johnny re-enrolled at MFI on July 22, 2021. MFI reported Johnny had started a medication to help with addiction. In August and September, 2021, he missed two tests and had three negative drug tests with MFI. During the same period he missed three DCFS drug tests.

Johnny attended the majority of his weekly monitored visits with Derek, but started missing visits over the summer. When he missed visits, Johnny did not call ahead to cancel, nor did he call afterwards to check on Derek. Derek continued to state that he would like to return to his father's care, but if that did not happen he wanted to remain with Alejandro and Diana.

By September 2021, Derek was showing major improvements in his behavior in his placement with Alejandro and Diana. He was attentive and helpful at home, and had made great progress with his schoolwork. Derek was affectionate toward his caregivers, and the three children always appeared

happy in the home. Alejandro and Diana wanted to adopt the children.

In the meantime, the parents had not consistently made themselves available to meet with DCFS, they had not demonstrated any change in conduct, and none of them had fulfilled drug testing requirements or otherwise had fully complied with their case plans. At the 12-month review hearing on September 30, 2021, the juvenile court continued reunification services against DCFS's recommendation.

Derek continued weekly monitored visits with Johnny, but Johnny was consistently late and always ended the visits a half hour early. Johnny missed the October 16, 2021 visit altogether and did not call; Derek cried. Asked about his visits with Johnny, Derek expressed frustration, saying, " 'My dad keeps on being late all the time. When we get to the park, he keeps getting late! Late! Late! Late!' "

In a progress report dated November 1, 2021, MFI reported Johnny had not attended any sessions in person since September 22, 2021, and had stopped drug testing with MFI after that date. Between August 2 and September 22, three out of seven of Johnny's MFI drug tests were negative, two were positive, and he had twice refused to test. He missed his DCFS-scheduled drug tests on September 16, October 1, and November 2, 2021.

Alejandro and his wife continued to express interest in adopting the children.

The juvenile court terminated the parents' reunification services at the 18-month review hearing on December 14, 2021, and set a section 366.26 hearing for April 12, 2022 (later continued to May 12, 2022).

### 5. Permanent Planning Period: December 2021 to May 2022

Johnny visited Derek for the last time on December 25, 2021. He called Derek on January 15, 2022, but Derek hung up the phone, crying. A visit scheduled for January 22, 2022, did not take place. Johnny had no other contact with Derek that month. Alejandro reported that even before January 2022, Johnny had missed many of his scheduled visits, which greatly affected Derek. Johnny told Alejandro he was living in Modesto with his father and was having difficulty getting to Los Angeles to visit Derek, but he did not accept Alejandro's offer to meet Johnny halfway for visits.

Johnny called Derek twice in February, but did not visit him. On February 23, 2022, when asked about visits with his father, Derek said, " 'I haven't even seen him for 6 weeks. He says that he loses his car. He always says no meeting no meeting it's been six weeks, six weeks since I've seen him.' " With regard to being adopted, Derek said, " 'It's been a year now and I've been waiting to be adopted.' " Nevertheless, Derek continued to express a desire to return to his father's care or remain with Alejandro and his wife.

DCFS reported that all three children always appeared happy, responsive, and very connected to their caregivers. Derek was openly affectionate with Alejandro, and his sisters "constantly" wanted to be picked up and held.

#### a. The section 388 petition

Johnny filed a section 388 petition on April 11, 2022, requesting that Derek be returned to his care or that reunification services be reinstated with unmonitored overnight and weekend visitation. In support of the petition Johnny stated

he had completed a 26-week domestic violence program and parenting classes and he had participated in individual counseling.[4]  He declared that Derek continued to be interested in visiting Johnny and would benefit from having his father in his life.  Johnny stated that he loved and wanted to support Derek.  But he did not acknowledge his limited contacts and failure to visit Derek after December 2021, nor did he provide any evidence in support of his section 388 petition from the period after termination of reunification services.

On April 12, 2022, the juvenile court set a May 12, 2022 hearing date for the petition.

### b. Further DCFS reports

In its report in response to the section 388 petition, DCFS noted a new vandalism charge against Johnny on December 17, 2021.  DCFS also stated it had previously documented Johnny's completion of the 26-week domestic violence program and parenting classes in its June 11, 2020 status review report.  As for individual counseling, DCFS reported it had been unable to verify Johnny's participation or progress in therapy since his claimed enrollment in December 2019.  Subsequently, Johnny had tested positive for amphetamines and methamphetamine, and on August 12, 2020, the juvenile court made new orders that Johnny complete a full six-month substance abuse program with aftercare, random drug testing, parenting classes, and individual counseling with a DCFS-approved therapist.  Thereafter, Johnny continued to struggle with his substance abuse, he consistently

---

[4] Documents submitted with the petition showed Johnny had completed these programs by August 2019.

failed to submit to random testing, and there was no indication he had completed any drug treatment program.

In April 2022, Derek said he had not seen Johnny in five months, since Christmas Day 2021. He expressed anger that his father did not visit, call or text, even on Derek's birthday. He did not believe Johnny would ever change, and he spoke positively about being adopted by Alejandro and Diana. Derek said he was happy in his caregivers' home and wanted to continue living with them. He added, " 'I don't know how I would feel about seeing my dad. I would feel sad if I saw him because it's been 5 months; 5 months' (the child became upset and yelling)! . . . 'I'm happy here and I want to live here.' "

Alejandro reported no improvement in the parents' attitudes or conduct toward their children, nor did they demonstrate that the children were a priority in their lives. Although Alejandro and his wife remained committed to adopting the children, they were unwilling to proceed if visits with the parents were required as part of the adoption.

### 6. *Section 388 hearing on May 12, 2022*

On the morning of the hearing, Johnny's counsel filed two exhibits. The first was a letter dated May 2, 2022, from New Hope Recovery in Modesto. The letter stated that Johnny had enrolled in an outpatient program on January 10, 2022, and completed the program on May 2, 2022. He had attended 12 individual sessions, 24 group sessions, and had 16 negative drug tests. The second exhibit was a letter from MFI dated May 11, 2022. It stated Johnny "was under MFI Recovery Center's medical care since Aug. 5, 2021. [He] was also enrolled at MFI's Medicated Assisted Treatment Program and has received 2 monthly Vivitrol injections."

The court denied the section 388 petition, noting there were no recent drug tests through DCFS, and there was no evidence the tests through the outpatient program met DCFS standards. Johnny had shown changing circumstances, but not enough to show a likelihood he would be drug-free going forward. As for the best interests of the child, the court found it was not in Derek's best interest to continue with this relationship based on Johnny's history of missing scheduled visits and failing to maintain regular contact with his son. The court expressed great disappointment over Johnny's failure even to show up for the child's birthday. The court added that Derek's own statements showed that the relationship between Derek and Johnny was broken as a result of Johnny's conduct, and the court had no confidence the relationship could be repaired in six months or at any time before Derek becomes an adult. It was therefore not in Derek's best interest to grant the petition.

### 7. *Section 366.26 hearing on May 12, 2022*

At the section 366.26 hearing, the juvenile court stated it was inclined to terminate parental rights. Johnny offered no additional evidence, but argued that he had visited regularly and consistently, the visits had gone well, and Derek had expressed interest in continuing to see his father. Based on the bond that existed between Derek and his father, Johnny argued that the section 366.26, subdivision (c)(1)(B)(i) exception applied, and Derek would benefit from a continued relationship with him.

The court found that Johnny was not showing up to visits, and the evidence showed none of the parents had maintained a beneficial bond with the children. The court terminated parental rights as to all three children.

**DISCUSSION**

## I. The Juvenile Court Properly Denied Johnny's Section 388 Petition

Johnny contends the juvenile court erred in denying the section 388 petition because he made a sufficient showing to require the court to vacate the section 366.26 hearing and return Derek to his care or reinstate reunification services with unmonitored visitation. We disagree.

### A. *Governing law and standard of review*

Pursuant to section 388, subdivision (a), a parent may petition the juvenile court to change, modify, or set aside any previous order of the court when the parent presents new evidence or a change of circumstances and demonstrates that modification of the previous order is in the child's best interests. (§ 388; *In re Christopher L.* (2022) 12 Cal.5th 1063, 1079–1080; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *In re J.C.* (2014) 226 Cal.App.4th 503, 525 (*J.C.*).) The parent seeking modification of the prior order has the burden of showing by a preponderance of the evidence that (1) a change of circumstances or new evidence warrants the proposed modification, and (2) the proposed change is in the child's best interests. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1194; *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

Reunification services are limited to reduce "the length of time a child has to wait for a parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308 (*Marilyn H.*).) For a child three years of age or older when first removed from a parent's physical custody, the parent and child shall receive 12 months of reunification services. (§ 361.5, subd. (a)(1)(A); *Michael G. v. Superior Court* (Apr. 6, 2023, S271809) __ Cal.5th __ [pp. 1, 8–9].)

13

Services may be extended up to 18 months (361.5, subd. (a)(3)(A)), but generally, if the child is not returned to the parent's physical custody at the 18-month mark, the juvenile court must terminate services and set a section 366.26 hearing. (*Michael G.*, *supra*, __ Cal.5th __ [at pp. 1, 8–9]; § 366.22, subd. (a)(3).)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' " (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *J.C.*, *supra*, 226 Cal.App.4th at p. 526.)  Indeed, "there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Stephanie M.*, at p. 317; *Marilyn H.*, *supra*, 5 Cal.4th at p. 302; *Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 489.)  And where "the permanent plan is adoption, that presumption is even more difficult to overcome." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 448–449; see also *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235 [parent's burden of "showing that changed circumstances demonstrate a return to parental custody is in the child's best interests . . . may be especially difficult to sustain for a parent who failed to continue with substance abuse treatment during the reunification period"].)

Thus, "[n]ot every change in circumstance can justify modification of a prior order." (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.)  To warrant changing or setting aside an order terminating reunification services, the change in circumstances or new evidence must be substantial, such that " 'the undoing of the prior order would be in the best interests of the child.' " (*In re*

*Mickel O.* (2011) 197 Cal.App.4th 586, 615; *Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re A.A.* (2012) 203 Cal.App.4th 597, 612.) " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206; *In re Mickel O.*, at p. 615.)

Determination of a section 388 petition is committed to the sound discretion of the juvenile court. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *J.C.*, *supra*, 226 Cal.App.4th at p. 525.) A reviewing court will not disturb the juvenile court's decision " ' "unless the [juvenile] court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations.] . . . ' "The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [juvenile] court." ' " (*Stephanie M.*, at pp. 318–319.)

### B. *Johnny failed to show changed circumstances in support of his section 388 petition*

Johnny's section 388 petition, filed on April 11, 2022, presented no new evidence or changed circumstances whatsoever. In support of the petition, Johnny attached two documents: one showing he had completed a 26-week domestic violence program on August 16, 2019, and the other showing that by June 19, 2019, he had completed a parenting program. But DCFS had already reported Johnny's completion of both programs in its December 12, 2019 status review report. The information in

these documents was before the juvenile court when it terminated reunification services and did not show changed circumstances.

Moreover, on August 12, 2020, the juvenile court sustained a new count against Johnny based on his methamphetamine and amphetamine abuse and ordered him to complete a new case plan. The new case plan required Johnny to complete a six-month full drug and alcohol program with aftercare, submit to random or on-demand drug testing, complete parenting classes, and undertake individual counseling. Johnny's petition contained no evidence of his participation in any substance abuse program, classes, or counseling services after August 2019.

Notwithstanding the facial deficiency of the petition, the juvenile court granted a hearing, and ordered Johnny to present any documentation to DCFS as soon as possible to enable DCFS to verify and make its assessment before the May 12, 2022 hearing. But Johnny declined to make a statement to DCFS and did not send DCFS any documentation about enrollment or completion of any programs in accordance with the case plan.

Johnny did not testify at the hearing, and the two letters he filed that morning were not authenticated. DCFS had no opportunity to verify the information in the letter from New Hope Recovery or seek further information or clarification about the four-month outpatient treatment program Johnny had completed. Although the letter from MFI was dated May 11,

16

2022, the information it contained had been reported to the juvenile court before reunification services were terminated.[5]

The juvenile court noted there were no recent drug tests from DCFS, and there was no information about what procedures and controls were in place to ensure the validity of the drug tests conducted through the outpatient program. In the two years since Derek was placed in foster care due to Johnny's methamphetamine abuse, Johnny attended substance abuse treatment for several months at a time, but then would relapse and resume his drug abuse.

Despite being ordered in August 2020 to participate in substance abuse treatment for a minimum of six months, by the time of the hearing on his section 388 petition in May 2022, Johnny had only managed to complete a four-month outpatient program. Thus, even taking the exhibits submitted on the day of the hearing at face value, the juvenile court was justified in concluding that while Johnny had made progress against his drug addiction, he had not yet "beaten these demons," and had failed to show materially changed circumstances. (See *In re N.F.* (2021) 68 Cal.App.5th 112, 121 ["In the context of a substance abuse problem that has repeatedly resisted treatment in the past,

---

[5] In his opening brief, Johnny claims the MFI letter showed he was "still connected with MFI by receiving twice monthly Vivitrol injections to assist in his sobriety." However, the letter referred to Johnny's association with MFI in the past tense and contained no indication that his participation in the program was ongoing. Moreover, given that Johnny's last drug test with MFI was on September 22, 2021, and he had not been to the office since then, his interpretation of the MFI letter appears disingenuous at best.

17

a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program"]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [seven months of sobriety insufficient to show changed circumstances given parent's history].)

Derek was eight years old when he was first placed in foster care and Johnny started receiving reunification services. He was 11 by the time the court terminated reunification services, and 12 on the date of the section 388 hearing. "Childhood does not wait for the parent to become adequate." (*Marilyn H., supra*, 5 Cal.4th at p. 310.) Johnny's showing of changing circumstances was not sufficient to establish that a substantial change of circumstances or new evidence warranted the modification Johnny sought in his section 388 petition.

### C. *Johnny also failed to show the proposed change was in Derek's best interest*

It was Johnny's burden to prove that the change in his circumstances and Derek's current circumstances were such that it was in Derek's best interest to be placed in Johnny's custody or to begin a new period of reunification services. In light of Johnny's history of inconsistent visitation and his failure to maintain regular contact with his son over the five months preceding the section 388 hearing, the juvenile court was entirely justified in finding that Johnny had failed to show that the modification proposed in the section 388 petition was in Derek's best interest.

In the past, Derek had enjoyed a positive visiting relationship with Johnny and had expressed a desire to live with him. In the section 388 petition, Johnny cited Derek's continued interest in visiting his father (which was noted in the DCFS's

18

April 12, 2022 section 366.26 report) as evidence that it was in the child's best interest to reunify with Johnny. But by the time of the hearing on May 12, 2022, Derek's interest in visiting Johnny had changed. Johnny's last visit with Derek had been on December 25, 2021; he did not visit Derek at all in the next four and a half months. During that time, Johnny did not even maintain regular telephone contact with his son.

Before, when Johnny had become inconsistent about attending scheduled visits, it upset Derek. It hurt Derek deeply when he no longer had any contact at all. Derek expressed anger and frustration about Johnny's failure to contact him, even on Derek's birthday.

However, Derek learned over time to process his feelings and had come to accept the absence of his father in his life. By the end of April 2022, Derek no longer wanted to live with Johnny, but wanted to remain in his "safe house" with Alejandro and Diana who took good care of him. Derek said he was happy living with his caregivers and wanted to be adopted by them. At the same time he expressed ambivalence about whether he would even want to visit Johnny anymore.

Although Johnny's move to Modesto had made in-person visits more difficult, nothing prevented him from maintaining telephone or video contact with Derek in the five months before the May 12, 2022 hearing. Yet, inexplicably, Johnny made no effort to stay in touch with his son. Johnny's choices had already caused chaos in Derek's young life, and there was no reason to believe any change would result if the juvenile court granted additional reunification services.

Although reunification is favored at the beginning of the dependency process, the opposite is true at the end of the process,

when the child deserves a stable, permanent home. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 420.) Indeed, "after a child has spent a substantial period in foster care and attempts at reunification have proved fruitless, the child's interest in stability outweighs the parent's interest in asserting the right to the custody and companionship of the child." (*Id*. at pp. 419–420.) After three and a half years of upheaval, Derek deserved the permanence and stability that adoption would provide.

The juvenile court did not abuse its discretion in finding the best interests of the child dictated denial of Johnny's petition under section 388 for custody of Derek or further reunification services.

## II. The Juvenile Court Properly Determined that the Exception to Termination of Parental Rights Under Section 366.26, Subdivision (c)(1)(B)(i) Did Not Apply

Johnny contends the juvenile court erred when it found the beneficial parental relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(B)(i) did not apply and terminated Johnny's parental rights. We conclude there was no error.

### A. *Applicable law*

After the juvenile court terminates a parent's reunification services, " 'the focus [of the proceedings] shifts to the needs of the child for permanency and stability.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52 (*Celine R.*); see *Marilyn H.*, *supra*, 5 Cal.4th at p. 304 ["the sole purpose of the section 366.26 hearing is to select and implement one of the listed permanent plans"].) At this point, adoption becomes the preferred permanent plan for the child, and if the juvenile court finds by clear and convincing evidence that the child is likely to be adopted, section 366.26,

subdivision (c)(1) requires the court to "choose that option—and as a result terminate the natural parents' parental rights." (*Celine R.*, at p. 49; *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  However, "the parent may avoid termination of parental rights in certain circumstances defined by statute.  One of these is the parental-benefit exception.  What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Caden C.*, at pp. 629, 631 [to establish the exception the parent must prove each of the three elements]; § 366.26, subd. (c)(1)(B)(i).)

As our Supreme Court has explained, the beneficial parental relationship exception is limited in scope.  (*Caden C., supra*, 11 Cal.5th at p. 631.)  The exception applies only where the juvenile court " 'finds a compelling reason for determining that termination would be detrimental to the child.' " (*Ibid*.)  And "in assessing whether termination would be *detrimental*, the [juvenile] court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.  [Citation.]  By making this decision, the [juvenile] court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.)

The court clarified in *Caden C.* that a parent's ongoing struggles with the issues preventing reunification, while relevant, do not constitute a categorical bar to establishing the exception.  (*Caden C., supra*, 11 Cal.5th at pp. 637–638.)  The critical question is whether the child's relationship with his or

her parent is so significant that it outweighs the benefits of adoption, not whether the parent has satisfactorily addressed the issues that led to dependency proceedings. (*Id.* at pp. 635–636.)

When the parent has established the application of the parental-benefit exception by showing it would not be in the best interest of the child to terminate parental rights, the court should select a permanent plan other than adoption. (*Caden C., supra,* 11 Cal.5th at pp. 636–637; see § 366.26, subd. (c)(4)(A).)

### B. *Standard of review*

An appellate court reviews the juvenile court's findings on the first two elements—regular visitation and whether the child would benefit from continuing the relationship—for substantial evidence. (*Caden C., supra,* 11 Cal.5th at pp. 639–640.) As for the juvenile court's findings on the third element—the ultimate question of whether termination of parental rights would be detrimental to the child due to the parent-child relationship—the appellate court reviews the juvenile court's weighing of the relative harms and benefits of terminating parental rights for abuse of discretion. (*Caden C.,* at p. 640; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 318.) In accordance with that standard, we will not disturb the juvenile court's decision unless the court " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' " (*Stephanie M., supra,* 7 Cal.4th at p. 318; *In re Katherine J.,* at p. 318.)

Where, as in this case, the juvenile court found the parent did not meet his or her burden of proof, the appellate court must determine whether the evidence compels a finding in favor of that parent as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of*

22

*O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.,* at p. 1528.)

### C. *Analysis*

The juvenile court properly found that Johnny did not prove the three elements of the beneficial parental relationship exception under *Caden C.*

#### 1. *The first element—regular visitation and contact*

As our Supreme Court has explained, the first element required to establish the exception is straightforward. "The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) As the juvenile court found, Johnny did not establish that he had maintained regular visitation and contact with his son.

Johnny did not visit Derek at all after December 25, 2021. Between December 25, 2021, and May 12, 2022, Johnny called Derek once in January and twice in February. But even before January 2022, Johnny's visits were inconsistent. He started missing scheduled visits in summer 2021, he was consistently late to those he attended, and he always ended the visits a half hour early.

Johnny argues that he maintained consistent visitation at an earlier point in time, but the juvenile court was not required to discount Johnny's complete lack of visitation in the four and a half months before the section 366.26 hearing and his inconsistency in the six months before that.

23

### 2. *The second element—a beneficial relationship*

Even if Johnny could establish he had maintained regular visitation and contact, he has not demonstrated the second element required to establish the exception, that is, the existence of "a *relationship*, the continuation of which would *benefit* the child." (*Caden C., supra*, 11 Cal.5th at p. 631.) In this regard, *Caden C.* instructs "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern.' " (*Id.* at p. 632.)

Johnny contends that guardianship, rather than adoption, would have been the better permanent plan for Derek because of "Derek's substantial, positive emotional attachment with his Father." However, "[a] positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) While Derek had a more positive attachment to Johnny earlier in the case, by April 2022 Derek said it made him "angry and sad" to talk about Johnny, and he expressed ambivalence about whether he would even want to see Johnny again. And from fall 2021 through spring 2022, Derek repeatedly voiced frustration and disappointment over Johnny's failure to prioritize his relationship with Derek. The hope and expectation that Johnny

24

would visit or call but chose not to—even on Derek's birthday—caused emotional turmoil for Derek, not security or stability.

### 3. *The third element—termination of parental rights would be detrimental to the child*

Johnny has also failed to establish the third element: that due to the benefits to Derek of maintaining the relationship with his father, termination of Johnny's parental rights would be detrimental to Derek. (*Caden C., supra,* 11 Cal.5th at p. 631.) To make this determination, the court must ask "what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) The juvenile court must then decide "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

Here, the question of what Derek's life would be like in an adoptive home without Johnny in his life was not hypothetical; the severing of the relationship with Johnny had already taken place in Derek's life over several months preceding the section 366.26 hearing. Over time, Derek had processed his feelings about Johnny and his absence from Derek's life. The stability of Derek's relationship with his caregivers and the support they gave him had already helped Derek overcome the loss of the relationship with Johnny. Derek felt safe in Alejandro and Diana's care, he loved them, and he wanted to continue living with them; he was waiting to be adopted by them.

On the other hand, Derek was not even sure he wanted to see Johnny again. And there is no reason to expect Johnny's long-established pattern of inconsistent visitation and contact would change. Johnny failed to show that whatever benefit

25

Derek would gain from a continued relationship with Johnny outweighed the benefits Derek would receive from adoption.

Accordingly, we conclude Johnny has not met his burden of demonstrating that severing his relationship with Derek would deprive the child of a substantial, positive emotional attachment to Johnny, such that even considering the benefits of a new adoptive home, termination of Johnny's parental rights would harm Derek. (See *Caden C., supra*, 11 Cal.5th at p. 636.) The juvenile court did not err in rejecting the beneficial parental relationship exception and terminating parental rights.

## III. ICWA

### A. *ICWA-related facts*

The record in this case contains no information to suggest that any of the children might be an American Indian child as defined by ICWA. Mother, Johnny, and Christopher repeatedly denied any known Native American heritage. Alejandro, the children's maternal great uncle, also denied American Indian ancestry. However, there is also no indication that DCFS contacted any other relatives about possible Native American ancestry. DCFS had the children's maternal grandmother's name and contact information, and a social worker spoke with her in October 2018. But it does not appear that any information was sought from the maternal grandmother about American Indian ancestry. Nevertheless, based on the parents' denials of Indian ancestry, the juvenile court found ICWA did not apply to Derek, Aliyah, or Alyssa.

### B. *Applicable law*

"ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal

standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881; 25 U.S.C. § 1902.) Under the ICWA as well as California's statutory scheme (Welf. & Inst. Code, § 224 et seq.), an " 'Indian child' " is defined as an unmarried person under the age of 18 who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a) [adopting the federal definition].)

Section 224.2, subdivision (a) imposes on DCFS and the juvenile court in every dependency proceeding "an affirmative and continuing duty" to determine whether ICWA applies. (§ 224.2, subd. (a); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).) The duty of inquiry includes asking, among others, the child, parents, extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child. (§ 224.2, subd. (b).) Inquiry must be made at the commencement of the dependency proceeding, and further inquiry is required where there is any reason to believe the child is an Indian child. (§ 224.2, subds. (c), (e); *D.S.,* at p. 1052.) Further inquiry includes contacting the tribes as well as gathering information from the parents and relatives. (§ 224.2, subd. (e); *D.S.,* at pp. 1052–1053.) Finally, if there is reason to know that the child is an Indian child, notice to the tribe in accordance with section 224.3, subdivision (a)(5) is required. (§ 224.2, subd. (f).)

We review the juvenile court's factual findings regarding ICWA compliance for substantial evidence, "[b]ut where the facts are undisputed, we independently determine whether ICWA's

requirements have been satisfied." (*D.S., supra,* 46 Cal.App.5th at p. 1051.)

## C. *The juvenile court and DCFS failed to make the requisite ICWA inquiries to extended family members*

We agree with the parties that the inquiry into the children's possible Native American heritage in this case was inadequate. Appellants contend the ICWA violation requires reversal of the termination orders and remand to enable DCFS and the juvenile court to comply with ICWA's inquiry requirements. Citing this court's decision in *In re Dezi C.*,[6] respondent asserts the error was harmless, but "[i]n the interest of minimizing delay to the children's permanency," does not oppose conditional affirmance of the orders with remand for ICWA compliance.

We accept the parties' agreement that remand is appropriate here, but our disposition is a conditional reversal of the termination orders.

Although respondent requests a conditional *affirmance*, we believe that a conditional *reversal* is appropriate for the limited purpose of allowing DCFS to satisfy its duty of initial inquiry under ICWA and thereby to eliminate the ICWA error in this case. We recognize that the Courts of Appeal are deeply split on whether to conditionally affirm or conditionally reverse in cases where there is no stipulation (compare, e.g., *In re J.K.* (2022) 83 Cal.App.5th 498, 507, 511 [conditionally affirming] and *In re Rylei S.* (2022) 81 Cal.App.5th 309, 326–327 [same] with, e.g., *In*

---

[6] *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578.

*re D.B.* (2022) 87 Cal.App.5th 239, 245, 249 [conditionally reversing] and *In re E.V.* (2022) 80 Cal.App.5th 691, 694, 701 [same]), but conclude that the functional effect of what we are doing should control in cases where the parties are stipulating to a limited remand following an order terminating parental rights. (*In re A.C.* (2022) 86 Cal.App.5th 130, 131–132 [accepting stipulation, but issuing disposition as conditional reversal]; *In re Veronica G.* (2007) 157 Cal.App.4th 179, 187.)

Our Legislature has defined for us when an appellate court may properly accede to the parties' request to "reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties"; specifically, we may do so only if we find (1) "[t]here is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal," and (2) "[t]he reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement." (Code Civ. Proc., § 128, subd. (a)(8).)

Under these standards, conditional reversal with a limited remand to comply with ICWA is appropriate in this case. The reason for the remand request is a practical one: It is not clear at this time what the test is for assessing "prejudice" in cases where the DCFS has not complied with its ICWA duty of initial inquiry; the error in this case would be prejudicial under some tests and not prejudicial under others; the California Supreme Court is not likely to resolve this issue for months, if not years; there is the possibility that a ruling by this court affirming the termination of parental rights (due to the absence of "prejudice" from the ICWA error under the *Dezi C.* test) might be undone months, if not

years, from now when the Supreme Court defines the proper test for "prejudice"; it is undisputed that, in dependency proceedings "involv[ing] the well-being of children," "considerations such as permanency and stability are of paramount importance" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293); and these considerations of permanency and stability are better served by a remand to eliminate any ICWA error *now* (and thereby to ensure that the order terminating parental rights can be final sooner rather than later) rather than rejecting remand and affirming (which leaves open the possibility that the ICWA issue—and, depending on the outcome of that issue, the entire case—will be re-opened months, if not years, down the line).

Given these considerations, there is "no reasonable possibility" that the interests of the nonparties (namely, the prospective adoptive parents and the Indian tribes) "will be adversely affected by the reversal" because those nonparties will benefit from the stability imparted by resolving the ICWA issue now instead of at some point in the future. And the permanency and stability imparted by a remand to resolve the ICWA issue now also "outweigh[s] the erosion of public trust" that arises from conditionally reversing the order terminating parental rights. Indeed, the remand in this case *enhances* the public trust by ensuring compliance with ICWA.

## DISPOSITION

The order denying Johnny's section 388 petition is affirmed. The orders terminating Johnny's and Christopher's parental rights are conditionally reversed. The matter is remanded with the following directions:

1. DCFS shall make reasonable efforts to ask all known and available extended family members whether Derek, Aliyah or Alyssa is or may be an Indian child.

2. DCFS shall document its efforts to interview all known and available extended family members as to whether Derek, Aliyah or Alyssa is or may be an Indian child, and shall provide a report with said documentation and the results of its interviews to the juvenile court.

3. At a noticed hearing, with counsel for the parties reappointed, the juvenile court shall make a finding regarding the ICWA's applicability, determine whether DCFS has interviewed all known and available extended family members, and proceed in accordance with Welfare and Institutions Code sections 224.2 and 224.3, including, if required, ordering DCFS to send notices with the above information to the appropriate tribes in accordance with the ICWA.

4. If, based on the completed inquiry, the juvenile court finds there is no reason to believe Derek, Aliyah or Alyssa is an Indian child, or if no tribe or agency determines Derek, Aliyah or Alyssa is an Indian child after notice has been provided pursuant to the ICWA, the orders terminating Johnny's and Christopher's parental rights shall be reinstated as the orders of the juvenile court. If notices are sent and the juvenile court receives responses from the noticed tribes, the juvenile court shall proceed in accordance with the ICWA if any tribe determines Derek, Aliyah or Alyssa is an Indian child.

5. At the conclusion of the proceedings and addressing compliance with federal and state law related to the ICWA, and

upon the juvenile court's findings and orders, the parties have the right to appeal from the renewed ICWA findings.

NOT TO BE PUBLISHED.

LUI, P. J.

I concur:

HOFFSTADT, J.

*In re Derek M.*, B320496
ASHMANN-GERST, J., Concurring in part and dissenting in part.

I agree with the majority that the juvenile court did not err in denying Johnny M.'s (Johnny) petition pursuant to Welfare and Institutions Code section 388[1] and in terminating his parental rights pursuant to section 366.26. However, I would not conditionally reverse the orders terminating Johnny and Christopher C.'s (Christopher) parental rights. Any alleged error pursuant to the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) was harmless.

As the majority accurately summarizes: "The record in this case contains no information to suggest that any of the children might be an American Indian child as defined by ICWA. Mother, Johnny, and Christopher repeatedly denied any known Native American heritage. Alejandro, the children's maternal great uncle, also denied American Indian ancestry. However, there is also no indication that [the Department of Children and Family Services (DCFS)] contacted any other relatives about possible Native American ancestry. DCFS had the children's maternal grandmother's name and contact information, and a social worker spoke with her in October 2018. But it does not appear that any information was sought from the maternal grandmother about American Indian ancestry." (Maj. Opn., at p. 26.)

Based upon the foregoing, the parties assert that the inquiry into the children's possible Native American heritage in

_____

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

this case was inadequate. (Maj. Opn., at p. 28.) Although DCFS contends that any error was harmless, it does not oppose a "conditional affirmance" for ICWA compliance. (Maj. Opn., at p. 28.)

The majority accepts the parties' agreement and conditionally reverses the judgment. I would not conditionally reverse the judgment because doing so effectively disregards our holding in *In re Dezi C.* (2022) 79 Cal.App.5th 769 (*Dezi C.*), review granted September 21, 2022, S275578.

In *Dezi C.*, we adopted the following rule: "[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Dezi C., supra,* 79 Cal.App.5th at p. 779.)

Here, the juvenile court may have erred (as DCFS seems to concede) by not asking the children's maternal grandmother about any possible Native American heritage. But, applying the "'reason to believe' rule" that we adopted in *Dezi C., supra,* 79 Cal.App.5th at page 779, I conclude that the juvenile court and DCFS's failure to make inquiries of this one extended family member was harmless because the record does not suggest a reason to believe that the children are Indian children within the meaning of ICWA. (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1014 ["where an appeal is taken from an order terminating

2

parental rights, ICWA inquiry error should require reversal only if prejudicial"].)

Mother and both fathers reported that they had no known Indian ancestry, and nothing in the record suggests that any parent was adopted such that "their self-reporting of 'no heritage' may not be fully informed [citation]." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779; contra, *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [a mother's denial of Indian heritage was unreliable because she was adopted at a young age and had no contact with her biological parents].) Neither father makes any proffer on appeal that either one of them or mother has any Indian heritage. (See *Dezi C.*, *supra*, at pp. 779, fn. 4, 786.)

My analysis is underscored by ICWA itself, which narrowly defines "Indian child" to include only a child who is himself or whose parent is a current member of a federally recognized Indian tribe. (§ 224.1, subd. (b).) I doubt that the children's maternal grandmother, if asked, would have been able to provide any different information about whether the children or their mother were current tribal members—particularly in the absence of any contrary suggestion from Johnny or Christopher, either before the juvenile court or on appeal. (See *In re A.C.* (2022) 75 Cal.App.5th 1009, 1023 (conc. & dis. opn. of Crandall, J.) ["Because such basic information is often known or easily discoverable by each respective parent, there is limited utility in remanding such matters for 'extended family member' inquiry"].)

As the majority implicitly concedes, *Dezi C.* remains good law during the pendency of review (Cal. Rules of Court, rule 8.1105(e)). Because Johnny and Christopher's argument does not satisfy the test for prejudice that we established in *Dezi C.*, I see no reason to reverse.

3

In reaching this conclusion, I am well-aware that the "overriding purpose of the hearings in dependency cases is to advance the best interest of the child." (*In re Z.C.* (2009) 178 Cal.App.4th 1271, 1279.) And, "time is of the essence" in a dependency proceeding (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1409); the children's best interests are most likely to be well-served by moving quickly to permanence (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846–847). But there is no evidence or argument set forth in the appellate record that the agreed-upon remand will promote the children's best interests by quickly moving them to a permanent placement.[2] (See *In re Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 995 ["These reversals unquestionably delay permanency for some of the most vulnerable children in our juvenile court system"].) As noted in July 2022, "In just the last 12 months, [the approach of automatic reversal without any showing of prejudice] to asserted ICWA error has resulted in, by our count, appellate courts returning more than 100 dependency cases to the juvenile courts with directions to conduct further ICWA inquiries *after* parental rights were terminated. At best, these reversals significantly delay entry of final judgments releasing children for adoption; at worst, they may result in

---

[2]    The delay could be even worse if a parent attempts successive or serial appeals challenging ICWA notice. While the court in *In re X.V.* (2005) 132 Cal.App.4th 794, 804 held that successive appeals challenging ICWA notice were impermissible, our Supreme Court has not yet decided "whether a parent would be precluded from raising an ICWA notice violation in a second or successive appeal." (*In re Isaiah W.* (2016) 1 Cal.5th 1, 14; see also *In re Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 1007–1008.)

4

potential adoptive parents deciding not to adopt." (*In re Ezequiel G.*, *supra*, at p. 1001.)

Furthermore, as set forth in our California Constitution, we only reverse trial court judgments for prejudicial error.[3] (Cal. Const., art. VI, § 13.) It follows that we do not reverse dependency cases for harmless error; "'the error must be prejudicial under the proper standard before reversal is appropriate.'" (*In re J.R.* (2022) 82 Cal.App.5th 526, 531.) There is good reason for this rule, particularly in dependency matters. "It is beyond dispute that ordering a child services agency to try to run down suggestions of possible Indian heritage has real costs to the agency's core mission of keeping children healthy and safe—there are only so many hours in a day and only so many child services agency employees on the payroll." (*In re H.V.* (2022) 75 Cal.App.5th 433, 441 (dis. opn. of Baker, Acting P. J.).)

Moreover, it is undisputed that we are not required to accept the parties' agreement to remand the matter for ICWA compliance. (See *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664 [court in a civil case may reject a stipulation that is contrary to public policy or incorporates an erroneous rule of law; court cannot surrender its duty and act as a puppet of the parties]; *People v. Segura* (2008) 44 Cal.4th 921, 931 [same is true with plea bargains in criminal cases]; *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 637 [rejecting the parties' joint stipulation for remand because it did not seek affirmance or reversal of the juvenile court's order and

---

[3] Thus, my conclusion might be different if DCFS had conceded prejudicial error. (See Maj. Opn., at p. 28 [DCFS asserts that the alleged ICWA error was harmless].)

5

only sought a remand with directions to order ICWA compliance]; *In re A.C.* (2022) 86 Cal.App.5th 130, 142 (dis. opn. Baker, J.).)

Thus, in deciding whether to accept the parties' request to conditionally reverse the judgment, we must consider the requirements of Code of Civil Procedure section 128, subdivision (a)(8). (*In re Rashad H.* (2000) 78 Cal.App.4th 376, 379; see also *Hardisty v. Hinton & Alfert* (2004) 124 Cal.App.4th 999, 1005 [presumption against stipulated reversals].) The statute provides, in pertinent part: "Every court shall have the power . . . [¶] . . . (8) To amend and control its process and orders so as to make them conform to law and justice. An appellate court shall not reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties unless the court finds both of the following: [¶] (A) There is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal. [¶] (B) The reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement." (Code Civ. Proc., § 128, subd. (a)(8).)

I am concerned that conditionally reversing the judgment here will adversely affect the public and erode confidence in the courts. "Public trust in the judiciary is uniquely at stake when the basis for termination of parental rights is called into question." (*In re B.D.* (2019) 35 Cal.App.5th 803, 820 ["Left vague [was] any reference to the *legal* basis for reversing, other

6

than the parties['] desire that we do so"].)[4]  Countless ICWA appeals akin to this one are currently pending in the courts of appeal.  Unfortunately, DCFS is not taking a consistent position—sometimes it is agreeing to a remand and other times it is arguing in favor of an outright affirmance—often leading to inconsistent results in the appellate courts, even in this Division. Issuing an opinion that simultaneously holds that *Dezi C.* remains good law while also reversing and remanding the matter for further ICWA proceedings based upon harmless error only adds to the unsettled state of the law.

I would affirm the orders terminating Johnny and Christopher's parental rights.


_____, J.
ASHMANN-GERST

---

[4]    The Second District does not have a local rule like rule 10 of the First District's local rules.  Rule 10 provides that a motion for stipulated reversal of judgment must be accompanied by "a joint declaration by the parties" that, in part, (1) describes the factual and legal issues, and (2) indicates whether the judgment involves important public issues or otherwise affects a significant number of people who are not parties to the litigation.